**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON  DIVISION**

|  |  |  |
|---|---|---|
|  | : |  |
|  | : |  |
| **GAIL ALTMAN WRIGHT,** | : |  |
|  | : |  |
| **Plaintiff,** | : | **Civil Action No.** |
|  | : | **5:07-CV-281 (CAR)** |
| **v.** | : |  |
|  | : |  |
| **HOSPITAL AUTHORITY OF HOUSTON** | : |  |
| **COUNTY d/b/a HOUSTON** | : |  |
| **HEALTHCARE,** | : |  |
|  |  |  |
| **Defendants.** |  |  |

_____

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Currently before the Court is Defendant's Motion for Summary Judgment [Doc. 11].  Through the present motion, Defendant asserts that it is entitled to judgment as a matter of law because Plaintiff's claims of disability discrimination brought pursuant to the Americans with Disabilities Act (herein "ADA"), 42 U.S.C. § 12101 – 12213, et. seq., are not supported by sufficient evidence to raise a genuine issue for a jury to decide.  Upon consideration of the briefs and evidence submitted and for the reasons discussed below, the Court agrees, in part.  Defendant's Motion for Summary Judgment is accordingly **GRANTED** in part and **DENIED** in part.

## I.  STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment must be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Johnson v. Clifton, 74 F.3d

1087, 1090 (11th Cir.1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex, 477 U.S. at 323.

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. See Fed.R.Civ.P. 56(e); see also Celotex, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir.1991). Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." Celotex, 477 U.S. at 323.

2

**FINDINGS OF FACT**

As is the case in many lawsuits, the present action involves two distinctly different interpretations of very the same events.  The facts, however, as viewed in the light most favorable to Plaintiff, are as follows:

Plaintiff Gail Altman Wright (herein "Plaintiff") is a registered nurse who suffers from a profound bilateral hearing loss caused by Meineres Disease.  The degree of her impairment fluctuates, and it is affected by external noises, i.e., she has greater difficulty hearing when there is background noise.  Plaintiff admits that her hearing loss has increased and her speech clarity has decreased in recent years.  She has difficulty understanding people, especially if she can not see their faces to read their lips.  She has, nonetheless, adjusted to her hearing loss and can communicate with others via either speech or signing, depending on her audience, and she considers her own speech clarity to be "excellent."  Plaintiff also utilizes an amplifier to hear phone conversations.

Despite her obvious limitations, Plaintiff was hired to work as a registered nurse on a PRN (or "as needed") basis for Defendant Houston Healthcare (herein HHC) on August 20, 2002.  HHC was fully aware of Plaintiff's hearing loss at this time.  Plaintiff served as a PRN nurse for HHC until she was relieved of her duties on February 13, 2006 and thereafter formally terminated in May of 2006.  The events leading to Plaintiff's termination were sparked by a breakdown in communication on February 2, 2006.  On that date, a monitor technician was unable to contact Plaintiff about a medical emergency.  Prior to this time, however, no complaints were made about Plaintiff's hearing limitations.

By all accounts, Plaintiff attempted to adjust and perform the duties of her position despite her hearing impairment.  Plaintiff, in fact, worked consistently for HHC, an average of three days a week, eight to twelve hours per day, for three and one-half years.  HHC allowed Plaintiff to choose her

schedule, her shifts, and the location in which she worked, and Plaintiff's choices resulted in her being paid the highest pay rate in the PRN pool. Plaintiff's skills were generally not questioned, and every year, she received performance evaluations of "average" or "above average" from her supervisor. It is thus undisputed that Plaintiff "met standards" as to her job performance from 2002 until 2006.

Plaintiff, however, was not without need for accommodation. It is undisputed that she cannot use traditional a telephone or stethoscope, she cannot hear a patient call her for help, and she cannot hear overhead announcements. Plaintiff is likewise unable to hear monitors or orders from physicians when there is excessive background noise. While employed by HHC, she thus relied on other nurses to assist her by writing down orders or occasionally tapping her on the shoulder to let her know that something needed to be done. Other nurses and patients would, at times, also have to repeat themselves multiple times so that Plaintiff could hear or understand what they were saying.

Plaintiff accordingly requested a number of accommodations from HHC to assist her in communicating with both patients and co-workers. HHC provided Plaintiff with a pager when she was first hired because she could not use the portable telephones carried by other nurses. Plaintiff carried the pager and always had it with her. Plaintiff also requested a telephone amplifier on each floor, a TTY telephone, a text telephone, a visual alarm to let her know when medication was ready to be picked up from the pharmacy, and a sign-language interpreter for nurse meetings and training sessions.

Apparently, not all of Plaintiff's requests were accommodated, and there is a dispute as to whether those that were made were sufficient. Plaintiff, for example, claims that her request for a telephone amplifier was not properly accommodated. Unaware of the proper procedure for requesting the telephone amplifier Plaintiff contacted the head nurse, engineering department, and the Clinical Directors of Nursing, to no avail. Plaintiff ultimately purchased her own telephone amplifier. At some

point, a telephone amplifier was installed on one floor in which Plaintiff occasionally worked, though it is disputed whether the amplifier was installed pursuant to Plaintiff's request. Plaintiff rarely worked on the floor in which it was installed, and she was unable to use the amplifier very often because the phone on which it was installed was used mainly by the charge nurse. Plaintiff eventually stopped taking phone calls from physicians because she had trouble communicating with them by telephone. Plaintiff would have been able to continue taking physician phone calls if HHC had installed the amplified phones as requested. Her only accommodation in this respect was that her co-workers agreed to take phone calls for her and write down any orders for her to execute.

Plaintiff likewise states that she was only provided an interpreter for a portion of the things that she wanted or needed to attend. Plaintiff found it difficult to hear the speaker at regular staff meetings because of the large number of people present. She requested that an interpreter be provided, but one was not provided for her. HHC did provide interpreters for Plaintiff for at least two continuing education classes. Still, HHC failed to provide an interpreter for three other classes she requested to take. As a result, Plaintiff stopped attending such classes and meetings.

Notwithstanding these accommodation issues, Plaintiff continued to perform her duties as a registered nurse without incident until February 2, 2006. On that day, one of Plaintiff's patients went into ventricular tachycardia, a critical medical condition. The monitor technician, following normal emergency procedures, attempted to call Plaintiff because she was the treating nurse. The tech, however, was not able to reach Plaintiff by telephone because, unlike the other nurses, Plaintiff carried a pager. HHC was aware that Plaintiff kept a pager in lieu of a telephone but did not provide the tech with a paging system at her station. Plaintiff was never paged about the emergency. She, nevertheless, realized what was going on and was the first to respond to her patient.

Following this incident, HHC conducted a patient safety evaluation to determine why the nurse

in charge of the patient's care could not be reached by the monitoring tech.  The cause of the February 2nd incident was concluded to be the monitoring tech's lack of access to a paging system to communicate with Plaintiff.  Plaintiff was not found to be at "fault."  Nonetheless, during the evaluation, HHC learned that nurse managers had other communication issues with Plaintiff.  Staff members had prior problems with Plaintiff being unable to use a portable phone, including problems with getting critical patient communications to Plaintiff quickly.  This led to a February 6, 2006 meeting of a HHC management team, in which they reviewed the parameters for a medical evaluation under the ADA and determined that Plaintiff needed to be advised of their concerns about patient safety.  They were also concerned whether Plaintiff could continue to meet the requirements of her position, noting that her written job description required that she have "good hearing acuity" and the "ability to distinguish sounds or tones."  A meeting was held with Plaintiff on February 13, 2006, wherein the management team advised Plaintiff of their concerns and requested that she agree to perform a "skills assessment" to determine whether she could in fact properly perform her duties and if she required additional accommodation.  The team further advised Plaintiff that she would not be scheduled to work until a complete evaluation was conducted.  Plaintiff agreed to comply.

The "skills assessment" was conducted by HHC's Education Department and required Plaintiff to perform selected duties under simulated conditions.  These scenarios were taken from a typical nursing shift. The assessment was designed to assess Plaintiff's overall listening skills and to determine whether she could hear well-enough to safely perform her duties.

There was no set standard for passing the examination, and Plaintiff was never informed of the results. The observations of the examiners were simply stated in a memorandum, and, according to her examiners, Plaintiff performed all essential duties properly.  One of the HHC nurse educators thought that Plaintiff did well in the assessment and that Plaintiff did not have a problem.  Another admitted

that she "expected" Plaintiff to have done worse.  The memorandum includes observations that "throughout the scenario, [Plaintiff] asked probing questions, clearly showing her understanding of ….. conversation;" "heard the phone ring, and correctly transcribed [lab] results;" "was able to understand and repeat the information [from a simulated physician] correctly;" and "correctly responded to . . . and placed a call to the physician."  Plaintiff likewise demonstrated an ability to understand verbal instructions despite the speaking variations of voice, turning of head, and covering of mouth.  Not all the observations were favorable, however.  The assessment memorandum also included observations that "[Plaintiff] did not hear the alarm until after she stopped concentrating on the order;" "[Plaintiff] had to ask for clarification nine times during the course of the assessment . . . " and "[Plaintiff] misunderstood what was said three times."

Upon review, HHC determined the results of the assessment to be "inconclusive."  The Clinical Director of Nursing in fact indicated that, upon reflection, the assessment was not sufficiently indicative of actual patient care problems.  She was concerned that the evaluation permitted tasks to take longer than normal and that Plaintiff was permitted to seek clarification multiple times.  HHC thus determined that it would need the expert assistance of an audiologist to evaluate Plaintiff's limitations and determine whether Plaintiff could safely treat patients and to what extent, if any, Plaintiff could be accommodated so that she could resume working.  Plaintiff indicated that she would comply.  Plaintiff also advised HHC that she had recently undergone a hearing evaluation and requested that those results be considered in lieu of another exam.  An HHC human resources representative, Ms. Stanley, promised to check if those test results would be acceptable to the management team and to get back with Plaintiff.  Plaintiff never received a response to her inquiry from Ms. Stanley, and her multiple attempts to reach Ms. Stanley thereafter were unsuccessful.

On March 9, 2006, Plaintiff received a phone call from an HHC representative, Pat Brown.  She

was to advise Plaintiff that an appointment with an audiologist had been made by HHC.  During the conversation with Brown, Plaintiff again requested that HHC accept a copy of a hearing test recently conducted in lieu of requiring another exam.  Ms. Brown indicated that this would be acceptable and advised Plaintiff to send in a copy of that exam.  Plaintiff agreed and stated that, if her exam was later deemed insufficient, she would participate in a new hearing exam as initially requested by HHC.  One day later, Ms. Brown called Plaintiff to inquire about the whereabouts of her hearing exam.  She was unable to reach Plaintiff and did not attempt to call her again.  Plaintiff never testified as to whether she ever forwarded a copy of her exam to HHC.  HHC representatives have since stated that they do not know when or whether they received a copy of Plaintiff's hearing exam.

On April 6, 2006, having heard nothing from HHC, Plaintiff sent a letter, inquiring as to why she had been "suspended without pay" and when she could return to work.  She further requested that HHC contact her by letter within seven days about her employment status.  HHC did not respond to Plaintiff's letter by mail.  Two attempts were made to contact Plaintiff by telephone.  Both were unsuccessful.

Subsequently, Plaintiff received a letter of termination dated  April 20, 2006 along with copies of two other letters that were never received by her previously.  In the first letter, HHC instructed Plaintiff to contact Ms. Brown to set up an appointment with an independent audiologist and indicated that her failure to do so would be deemed a voluntary resignation.   The second letter accordingly informed Plaintiff that her failure to respond to the first letter was deemed a resignation, effective March 24, 2006.  The third letter, the so-called termination letter, again informed Plaintiff of her failure to respond to their letters and HHC's inability to reach her by telephone.  HHC requested that Plaintiff call HHC no later than May 1, 2006 to discuss her employment status and again advised Plaintiff that her failure to respond will be considered a voluntary resignation, effective March 24, 2006.

Plaintiff did not respond as requested in the letter of termination.  She did not call any of the HHC representatives listed in the letter.  Rather, Plaintiff mailed a letter to HHC, which was received on May 1, 2006, in which she  informed HHC that she believed that she had been discriminated against and informed HHC that she had "not resigned" and that she was "awaiting [their] decision to return [her] to work, or to terminate [her] based on discrimination."  The letter did not address the specific requests set out in HHC's letter of April 20, 2006 or reference the medical examination.  At that point, Plaintiff had already contacted the EEOC to file a charge of discrimination and states that this is why she never called HHC as requested in the termination letter.  Plaintiff's employment was officially terminated as of May 26, 2006, and the EEOC issued Plaintiff a "Notice of Right to Sue" on April 24, 2007.  Plaintiff filed the present lawsuit against HHC, on July 23, 2007, alleging that while employed by HHC she was the victim of discrimination (via failure to accommodate and discharge because of her disability) in violation of the ADA.

## DISCUSSION

Through the motion at bar, HHC contends that it is entitled to judgment as a matter of law because Plaintiff's claims of disability discrimination are not supported by sufficient evidence to raise a genuine issue of material fact.  Plaintiff's claims are two-fold.[1]  In her Complaint, she states that HHC (1) "failed and refused to accommodate" her hearing impairment and (2) "discharged her from her position . . . because of her disability." [Pl.'s Comp. at ¶ 19].  Each of plaintiff claims thus falls within

---

[1] In its motion for summary judgment, HHC asserts that Plaintiff's reference to "harassment" in her Complaint was not intended to state a separate claim of hostile work environment under the ADA and that the term was instead used only in its colloquial sense.  Plaintiff did not respond to this assertion on summary judgment.  Thus, to the extent that Plaintiff may have initially stated a hostile work environment claim in her Complaint, it is deemed abandoned.  See McMaster v. United States, 177 F.3d 936, 940-41 (11th Cir.1999) (noting that a claim may be considered abandoned when the allegation is included in the plaintiff's complaint, but he fails to present any argument concerning this claim to the district court); Lyes v. City of Riviera Beach, Fla., 126 F.3d 1380, 1388 (11th Cir.1997) (noting that "'the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned'") (citation omitted).

the purview of the ADA, which provides that covered employers shall not "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

I.  Standard for Evaluating Plaintiff's Claims under the ADA

Plaintiff does not purport to have any direct evidence of discrimination in this case.  Plaintiff, however, may still prove her disparate treatment claim under the ADA "through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases." Wascura v. City of South Miami, 257 F.3d 1238, 1242 (11th Cir.2001). "This burden-shifting analysis, often referred to as McDonnell Douglas burden-shifting, is a three-step process: (1) A plaintiff establishes a prima facie case of disparate treatment; (2) a defendant articulates a legitimate, non-discriminatory reason for the challenged action; and (3) a plaintiff meets the ultimate burden of proof by proffering "sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual." Nadler v. Harvey, No. 06-12692, 2007 WL 2404705, *4 (Aug. 24, 2007) (unpublished) (citing Wascura, 257 at 1243.

There is some ambiguity as to whether the familiar McDonnell Douglas framework applies to "failure to accommodate" cases. Jones v. Georgia Dep't of Corr., 2008 WL 779326 (N.D. Ga.2008); Alexander v. TFM Boral Brick, Inc., 2008 WL 4951240 (M.D. Ala. 2008); Allmond v. Akal Sec., Inc., 2007 WL 2904023 * 4 (M.D. Ga. 2007).  Clearly, "the purpose of the McDonnell Douglas analysis is to determine the sufficiency of intentional discrimination claims."  Jones, 2008 WL 779326 at *5. "Since intent is inherently difficult to prove, McDonnell Douglas allows an inference of intent to be drawn if certain facts are proved, i.e., if a prima facie case is made."  Id.  Unlike other types of

discrimination claims, however, a "failure to accommodate" claim under the ADA does not require a showing of discriminatory intent.  Nadler, 2007 WL 2404705 at *8.  "Rather, the failure to provide reasonable accommodations is a *per se* violation of the ADA, regardless of intentions."  Alexander, 2008 WL 4951240 at 11; Jones, 2008 WL 779326 at *5.  "In other words, a claim that an employer failed to . . .  provide reasonable accommodations to qualified employees, does not involve a determination of whether that employer acted, or failed to act, with discriminatory intent." Id.  Such claims require only a showing that the employer failed "to fulfill its affirmative duty to 'make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability' without demonstrating that 'the accommodation would impose an undue hardship on the operation of the business.'"  Nadler, 2007 WL 2404705 at *4.

Accordingly, in Nadler the Eleventh Circuit Court of Appeals held that the McDonnell Douglas burden-shifting framework, "while appropriate for determining the existence of disability discrimination in disparate treatment cases, is not necessary or useful in determining whether a defendant has discriminated by failing to provide a reasonable accommodation." 2007 WL 2404705 at *9.  Of course Nadler, because it is an unpublished decision, is not binding on this Court and merely provides persuasive authority. This Court nevertheless agrees that the McDonnell Douglas analysis is not suited for evaluating failure to accommodate claims.

With these standards for evaluation in mind, the Court will now consider each of Plaintiff's claims.

II.     Failure to Provide Reasonable Accommodation

Plaintiff first states a claim based on HHC's alleged failure to provide reasonable accommodation for her hearing impairment.  Clearly, discrimination under the ADA includes an employer not making "reasonable accommodations" for a qualified employee's known disability. 42

U.S.C. § 12112(b)(5)(A).  The ADA thus imposes an affirmative duty on employers to provide reasonable accommodations for an employee's disability unless doing so would pose an undue hardship.  Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir.1996).  Here, Plaintiff claims that HHC failed to provide reasonable accommodations for her disability and produces evidence that she requested the following accommodations: a telephone amplifier on each floor, a TTY telephone, a text telephone, a visual alarm to let her know when medication was ready to be picked up from the pharmacy, and a sign-language interpreter for nurse meetings and training sessions.  These accommodations were apparently not met, and to the extent that HHC attempted to provide some accommodation, Plaintiff identifies evidence that the accommodation provided fell short of what was requested or required by the ADA.

On summary judgment, however, HHC argues that Plaintiff cannot establish "a prima facie case" of discrimination as to this claim per the familiar McDonnell Douglas burden-shifting analysis. As found above, that analysis is not necessary or useful in determining whether an employer has failed to provide a reasonable accommodation.  See Nader, 2007 WL 2404705, *8-9.  Rather, the question for the Court is simply whether Plaintiff has identified sufficient evidence that HHC failed to provide a reasonable accommodation for her hearing loss, as it is expressly required to do under the ADA. HHC's only available defense is that the necessary accommodation would pose an undue hardship. Id. at *9.  HHC has not raised this affirmative defense in the motion at bar.  Thus, Plaintiff can satisfy her burden on this claim by showing (1) that she is an otherwise qualified disabled individual within the meaning of the ADA and (2) that HHC failed to provide her with reasonable, requested accommodations. Id.; Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001) (explaining that a failure to accommodate claim requires that a plaintiff show that she was disabled, she was otherwise qualified, and a reasonable accommodation was not provided).

12

In this case, there is no issue as to whether Plaintiff was disabled as required by the statute. HHC argues, instead, that Plaintiff is not "otherwise qualified" for her position as a registered nurse. Under the ADA, a plaintiff is "otherwise qualified" if she, with or without any reasonable accommodation, can perform the essential functions of her job.  42 U .S.C. § 12111(8).  This is a two-step inquiry, requiring the Court to determine whether Plaintiff can perform the essential functions of her job and, if not, whether a reasonable accommodation would allow her to do so. Id.

Here, HHC contends that Plaintiff could not perform the essential functions of her job as a registered nurse because she could not use a traditional telephone to receive immediate communications in a patient emergency, could not use a stethoscope, could not hear a patient call her for help, and could not hear overhead announcements.  Plaintiff is likewise unable to hear monitors or orders from physicians when there is excessive background noise and needs to rely on other nurses to assist her by writing down orders or occasionally tapping her on the shoulder to let her know that something needs to be done. These facts are undisputed. What is disputed, however, is whether these limitations prevented Plaintiff from performing the essential functions of her job *with* reasonable accommodation. Plaintiff claims that she can hear, to some extent, without the aid of an interpreter and that she could perform all essential functions of her job if the appropriate accommodations were made.

The first question, therefore, is what are the "essential functions" of the Plaintiff's job ?  This is disputed between the parties.  Generally, "'[e]ssential functions' are the fundamental job duties of a position that an individual with a disability is actually required to perform."  Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000) (citing 29 C.F.R. § 1630.2(n)(2)(1)).  "Determining whether a particular job duty is an essential function involves a factual inquiry to be conducted on a case-by-case basis." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1258 (11th Cir.2001).  "[C]onsideration shall be given to the employer's judgment ... and if an employer has prepared a written description before

advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

Here, HHC provides an excerpt of Plaintiff's written job description, which expressly requires the employee to have "good hearing acuity," i.e., the "ability to distinguish sounds or tones."  Plaintiff does not dispute that this sensory criteria is included in her official job description or that she does not have good hearing acuity without accommodation.  Plaintiff argues, however, that this description does not set forth the "essential functions" of the relevant job.  HHC, in fact, does not point to evidence as to exactly what "functions" or job duties are required of a registered nurse.  Of course, this Court could theoretically find that the essential functions of Plaintiff's position required her to use a traditional telephone and stethoscope, hear a patient call her for help, hear overhead announcements and monitors, and hear and understand patient and physician requests without having to ask them to repeat themselves or write information down; but, on summary judgment, the Court cannot do so without evidence that such functions are essential.  Again, HHC has pointed to no such evidence for the purposes of this motion.  On the other hand, Plaintiff provides evidence that she could perform the functions of a registered nurse with the appropriate accommodation, be it an amplified telephone or stethoscope, visual alarm, interpreter, or other adjustment of procedure. She further shows that she was in fact able to perform the "essential functions" of her job *with* some accommodation without incident for more than three years.  During this time, Plaintiff always received favorable performance evaluations from HCC, scoring her performance as "average" or "above average."  Plaintiff also identified evidence that, following her skills assessment, examiners reported that she performed all essential duties properly. One of the HHC nurse educators stated that Plaintiff did well in the assessment and that she did not have a problem, and another admitted that she expected the results of Plaintiff's assessment to be worse. A nurse that worked with Plaintiff on the floor further testified that she felt Plaintiff was competent to

take care of patients.  On this point, therefore, the Court finds that Plaintiff has created a triable issue of fact.  Although Plaintiff may not succeed on this issue at trial, there is evidence in the record that Plaintiff could perform the necessary functions of her position with accommodation.

The next issue is whether there is sufficient evidence before the Court that HHC failed to provide Plaintiff with reasonable accommodations to allow her to perform these functions.  A reasonable accommodation is a modification or adjustment to an employee's work environment, schedule, or duties (or other such adjustment) that enables a disabled employee to perform the essential functions of the job.  42 U.S.C.A. § 12111(9);29 C.F.R. § 1630.2(o)(1).  The determination of what is a reasonable accommodation is job-specific.  The burden of identifying an accommodation rests with the employee, "as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable."  Stewart v. Happy Herman's Cheshire Br. Inc., 117 F.3d 1278, 1286 (11th Cir.1997).

In this case, it is apparently undisputed that Plaintiff requested a number of accommodations while employed by HHC, including telephone amplifiers on each floor, a TTY telephone, a text telephone, a visual alarm, and a sign-language interpreter.  HHC did provide one amplifier and a sign-language interpreter for at least two recurrent training classes.  Plaintiff contends, however, that HHC still failed in providing reasonable accommodations because the amplifier was only placed on one floor and not for her use and that she was not afforded a sign-language interpreter for all of the classes and meetings she needed to attend.  Plaintiff further contends that even the accommodation of allowing her to carry a pager in lieu of a portable telephone was inadequate because monitoring techs were not likewise provided with the necessary paging systems to reach her in case of emergency.

HHC does not refute these arguments or otherwise claim that these were not "reasonable accommodations;" instead, HHC argues that any claim based upon these alleged failures is "time

barred."   HHC, unfortunately, chose to raise this argument for the first time in its Reply Brief, and Plaintiff has not had the opportunity to respond.   This Court will not and should not consider an argument raised for the first time in a Reply.   See United States v. Coy, 19 F.3d 629, 632 n. 7 (11th Cir.1994) ("[a]rguments raised for the first time in a reply brief are not properly before a reviewing court") (citation omitted); United States v. Martinez, 83 F.3d 371, 377 n. 6 (11th Cir.1996) (declining to consider arguments raised for the first time in a reply brief); Fisher v. Ciba Specialty Chemicals Corp., 238 F.R.D. 273, 317 n. 89 (S.D. Ala.2006) ("this argument is not properly raised because plaintiffs submitted it for the first time in their reply brief").   Otherwise, the Court may find itself in a scenario "in which endless sur-reply briefs are filed, or the Court is forced to perform a litigant's research for it on a key legal issue because that party has not had an opportunity to be heard, or a movant is incentivized to save his best arguments for his reply brief so as to secure a tactical advantage based on the nonmovant's lack of opportunity to rebut them." Hardy v. Jim Walter Homes, Inc., 2008 WL 906455 * 8 (S.D. Ala., April 1, 2008).  The Court thus finds that Plaintiff has met her burden of providing a triable fact as to this limited issue of whether HHC failed to provide her with reasonable accommodation of for her hearing impairment.

However, to the extent that Plaintiff claims that HHC failed to accommodate her hearing impairment by providing a special stethoscope that works with her hearing aid or an overhead monitor so that she can read any announcement made, those claims must fail.  There is no evidence before the Court that Plaintiff ever identified or requested such accommodations for HHC, and it was her burden to do so.  See Stewart, 117 F.3d at 1286; see also 29 C.F.R. pt. 1630 App. § 1630.9 ("In general ... it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.").  Clearly, "[o]nly after the employee has satisfied this burden and the employer fails to provide that accommodation can the employee prevail on a claim that her employer has discriminated

16

against her." Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1364 (11th Cir. 1999). HHC had no obligation to provide these (or other) accommodations without Plaintiff's involvement and cooperation. The employer's only obligation is to an engage in an informal process with the employee to identify the precise limitations posed by the employee's disability and the reasonable accommodations that could overcome those limitations. Stewart, 117 F.3d at 1286; see also 29 C.F.R. § 1630.2(o)(3) (an employer has an obligation "to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation."). HHC has identified evidence that it engaged in such an inquiry with Plaintiff by meeting with her following the February 2, 2006 incident and requesting that she participate in a skills assessment to determine whether she needed further accommodation or could otherwise perform the essential functions of her job. There is no evidence that Plaintiff assisted in either the meeting or the assessment in identifying any accommodation that would allow her to better perform the duties of her position. The same is true of HHC's request that Plaintiff participate in a medical examination. For whatever reason, good or bad, Plaintiff did not comply with this request and has not identified evidence that she provided another examination for HHC to consider or that she otherwise aided HHC in determining whether she needed accommodation. "Liability simply cannot arise under the ADA when an employer does not obstruct an informal interactive process; makes reasonable efforts to communicate with the employee and provide accommodations based on the information it possesses; and the employee's actions cause a breakdown in the interactive process." Stewart, 117 F.3d at 1287. Summary judgment is thus **GRANTED** in favor of HHC as to any claim arising from the failure of HHC to grant such accommodations.

III.    <u>Disparate Treatment.</u>

In her Complaint, Plaintiff also alleges that HHC unlawfully subjected her to disparate treatment "because of her disability."   To state a disparate treatment claim under the ADA, a Plaintiff must demonstrate that she (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of her disability."   <u>Cash v. Smith</u>, 231 F.3d 1301, 1305 (11th Cir. 2000).  Again, in this case, it is not disputed that Plaintiff is disabled as required by the Act, and, as found above, Plaintiff has raised a genuine issue as to whether she is also a "qualified individual" under the Act. Thus, at issue is whether there is sufficient evidence for a jury to determine that Plaintiff was subjected to unlawful discrimination *because* of her disability.

This generally requires that the employee create a question of fact as to whether she suffered an "adverse employment action" and whether her disability was a substantial or motivating factor that prompted the employer to take that action.  <u>See</u> <u>Doe v. Dekalb County School Dist.</u>, 145 F.3d 1441, 1448 (11th Cir.1998) (describing "adverse employment action" concept as "an essential element of a prima facie ADA case"); <u>Boyd v. Province Healthcare Co., Inc.</u>, 2005 WL 3132394 * 4 n.16 (S.D. Ala., Nov. 22, 2005) (same).  Here, Plaintiff asserts that she was both "suspended" from performing her duties and terminated from her position.  While HHC may take issue with the terminology used by Plaintiff, it is nevertheless undisputed that both of these decisions materially affected the terms and conditions of Plaintiff's employment.  <u>Gupta v. Florida Bd. of Regents</u>, 212 F.3d 571, 587 (11th Cir.2000) (an adverse employment action equates to "an ultimate employment decision, such as discharge or failure to hire"); <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1239 (11th Cir.2001) (an adverse employment action can be found if the employer's action impacted "the terms, conditions or privileges of the plaintiff's job in a real and demonstrable way . . .").  She has thus satisfied the requirement of showing that she suffered an adverse employment action.  <u>Id.</u>

To complete the prima facie test for disability discrimination, Plaintiff need only create a fact issue as to whether her disability was a substantial or motivating factor that prompted HHC to take these actions.  On this point, Defendants contend that Plaintiff fails because she cannot establish that employees without a hearing impairment were treated more favorably.  This is one way of proving discriminatory intent.  See, e.g., Rowe v. Bd. of Trustees for Fla. Sch. for Deaf and Blind, 70 F. Supp.2d 1283 (M.D. Fla. 1998) (requiring an ADA plaintiff to prove that she was treated differently by her employer than other similarly-situated individuals who do not belong to her protected group).  Plaintiff does not attempt to squarely identify a similarly situated individual who was treated differently.  Instead, Plaintiff generally points to evidence that she was not the "cause" of the February 2, 2006 incident which threatened the life of a patient and that she was thus singled out, *because* of her disability, for suspension, without pay and required to participate in a skills assessment which had no clear pass/fail criteria. The Court, however, does not find this evidence sufficient to raise a jury issue as to discriminatory intent.

First, it should be noted that Plaintiff does not claim that she was subjected to an "improper medical inquiry" in violation of the ADA, and the skill assessment in which Plaintiff was asked to participate is not an adverse employment action.  It did not in anyway alter her "compensation, terms, conditions, or privileges of employment," deprive her of employment opportunities, or adversely affect her status as an employee.  Gupta, 212 F.3d at 587.  Thus, the sole fact that she was made to take part in the assessment does not support a finding of discrimination.  Rather, the evidence identified in this case requires the opposite result.

Here, the undisputed evidence shows HHC conducted a routine patient safety evaluation after the February 2, 2006 incident to determine why the nurse in charge of the patient's care could not be reached by the monitoring tech.  The evaluation revealed that nurse managers had other communication

19

issues with Plaintiff, regardless of who was at "fault" for the incident under investigation.  Nurses

specifically noted concerns about Plaintiff's ability to communicate in emergency situations.  HHC was

also aware that interpreters were not available to Plaintiff during day-to-day patient care.  Based upon

the information received, HHC contends that it had reasonable concerns that Plaintiff's "ability to

perform the essential functions of [her] job was impaired" and that she potentially "posed a direct threat

to her patients."[2]  The ADA in fact allows some inquiry and medical examination in such

circumstances.[3]  Plaintiff also now concedes that her hearing and speech clarity had declined while she

was employed by HHC, and that, at the time of the February 2, 2006 incident, she had ceased taking

phone calls from physicians and attending staff meetings because further accommodations for her

hearing impairment were needed.  Clearly, HHC was not required to wait until a potential threat

becomes a reality before it takes action to evaluate an employee and her needs.  See Watson v. City of

Miami Beach, 177 F.3d 932, 935 (11th Cir. 1999).  Rather, a legitimate "business necessity" exists for

such inquires and examinations where the employer has good cause for concern as to whether the

employee can perform her job without posing a threat to others.  Id.; Harris, 206 F.3d at 842 n.3.

   In line with HHC's concerns, a meeting was held with Plaintiff on February 13, 2006, wherein

---

[2] The Court is not making a finding as to whether Plaintiff was "a direct threat" to patients.  There is insufficient evidence before the Court to make such a finding.   In determining whether an individual would pose a direct threat, the factors to be considered include: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and  (4) the imminence of the potential harm. 29 C.F.R. § 1630.2(r) (2000).  The Court is only acknowledging HHC's evidence that it questioned as to whether she was such a threat.

[3] When an employer reasonably believes that an applicant's known disability will interfere with the performance of a job-related function, an employer may ask that particular applicant to describe or demonstrate how she would perform the function, with or without reasonable accommodation.  Harris v. Harris & Hart, Inc., 206 F.3d 838, 842 n.3 (9th Cir. 2000); Kennedy v. Superior Printing Co., 215 F.3d 650, 656 (6th Cir.2000) ("The ADA 'permits employers ... to make inquiries or require medical examinations necessary to the reasonable accommodation process....' ") (quoting 29 C.F.R. § 1630.14(c)).

   See also EEOC, Enforcement Guidance: Disability Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act, 2 EEOC Compl. Man. (CCH) P6910 (2000), available at http:// www. eeoc.gov/policy/docs/guidance-inquiries.html (last visited Jan. 19, 2009). The EEOC Enforcement "Guidance was designed for . . . use by EEOC investigators, pending coordination with other federal agencies. It is not binding law, but as a detailed analysis of the relevant ADA provisions, it aids [the court's] interpretation of the [ADA]."  Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 673 (1st Cir. 1995) (cite omitted).

the management team advised Plaintiff of their concerns and inquired as to whether she would agree to a "skills assessment" to determine if could perform her duties. Plaintiff voluntarily agreed to participate in the assessment and does not now contend that she was subjected to an "improper medical inquiry," i.e., one which is not consistent with a business necessity in violation of the ADA regulations. See 42 U.S.C. § 12112(d)(4). It is further undisputed that HHC's inquiry and skills assessment was limited to determining whether Plaintiff could perform her essential job functions. There is no evidence that the assessment was disciplinary. The evidence indicates that HHC learned of concerns, as part of the routine patient safety evaluation, giving it reason to question whether Plaintiff could safely provide patient care or whether she may require additional accommodation. It is, thus, of little or no effect that other nurses on her floor or otherwise involved in the February 2, 2006 incident were not subjected to similar treatment, as there is no evidence that HHC had similar concerns about others.

To this end, the Court must also find that Plaintiff has failed to produce sufficient evidence showing that her "suspension" pending the skills evaluation was discriminatory. While it may have been an adverse employment action, Plaintiff has not presented any evidence that it was based upon any other motivation than to remove her from her position until the job-related medical inquiry could be completed. There is likewise no evidence before the Court that HHC acted differently in any other instance in which it was confronted with information that an employee may not be able to perform her essential functions or that patient safety was at risk. Plaintiff has not shown that HHC knew of similar potential risks posed by other employees (whether it arise from the disability of a covered individual or the general incompetence of a non-disabled person) and chose not suspend those employees pending a reasonable investigation or assessment. Compare, Collis v. Gwinnett County, Ga., 156 F.Supp.2d 1342, 1350 (N.D. Ga. 2001) (employee had not shown discharge was discriminatory where he had failed to provide evidence of similarly situated employees who were treated differently); Miller v. Gen.

21

Wholesale Co., Inc., 101 F.Supp.2d 1374, 1380 (N.D. Ga. 2000) (same).

As to her ultimate termination, Plaintiff attempts to show discriminatory intent by identifying evidence that HHC decided her skills assessment was "inconclusive," despite evidence that she did well on the examination, and then required her to undergo an unnecessary hearing evaluation.  It is undisputed, however, that the skills assessment resulted in critiques that were both favorable and unfavorable.  HHC, as an employer, was thus entitled to make the decision to require further testing to determine if Plaintiff required additional accommodation to perform her essential functions.  Clearly, this Court is not to "sit as a super-personnel department that reexamines an entity's business decisions." Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir.1991)).  Moreover, as noted above, the ADA permits an employer to require medical examinations necessary to the reasonable accommodation process.  See 29 C.F.R. § 1630.14(C).  Plaintiff does not dispute this fact, and Defendant further contends that its request for a medical examination was in fact "a business decision based upon objective facts."

The Court is unpersuaded by evidence that one examining nurse admitted that Plaintiff did better than she "expected" on the assessment and that there were no clear "pass / fail" criteria set before the assessment was conducted.  The nurse's statement supports an inference that she had real concerns about Plaintiff's communication skills just as it may support an inference of discrimination. Discriminatory intent is not easily drawn from the comment.  The same is true about HHC's failure to set clear pass/fail criteria before administering the assessment.  It may be evidence of poor planning by HHC, but it does not necessarily establish an animus on the part of the examiners.  And again, Plaintiff has failed to identify evidence that HHC acted differently on other occasions.  The Court finds it to be more relevant that HHC was fully aware of Plaintiff's hearing limitation when she was first hired and thereafter consistently allowed her to work a full schedule for over three years, never

questioning her skills as a nurse or giving her an unfavorable evaluation before the February 2nd incident.

Yet, even if Plaintiff has identified sufficient evidence that her suspension and subsequent termination were motivated by a discriminatory animus, the Court's inquiry does not end here. Unlike Plaintiff's ADA claims alleging that HHC failed to accommodate her disability, her ADA claims based upon alleged disparate treatment is analyzed under the familiar McDonnell Douglas burden-shifting analysis. Wascura, 257 F.3d at 1242. As discussed above, this inquiry is three part: (1) A plaintiff establishes a prima facie case of disparate treatment; (2) a defendant articulates a legitimate, non-discriminatory reason for the challenged action; and (3) a plaintiff meets the ultimate burden of proof by proffering "sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual." Id. at 1243. So, assuming Plaintiff established a prima facie case of discrimination, HHC is entitled to now articulate a legitimate non-discriminatory reason for its decisions. This burden is "exceedingly light;" HHC must merely proffer a non-discriminatory reason, not prove it. Perryman v. Johnson Prods., Co., 698 F.2d 1138, 1142 (11th Cir. 1983).

Here, HHC identifies evidence that its reason for requiring the skills assessment and audiology examination of Plaintiff was not an animus against those having hearing impairment but rather its discovery of objective evidence of communication issues other care providers had with Plaintiff and resulting concern that Plaintiff's limitations had either worsened or were more severe than previously known. Plaintiff in fact concedes that her hearing and speech clarity had declined in recent years. There is no suggestion that the patient safety evaluation conducted after the February 2, 2005 incident was discriminatory, and, on summary judgment, HHC produces deposition testimony that this objective evaluation brought to light problems of getting critical patient information to Plaintiff quickly. Plaintiff

23

identifies no evidence to the contrary.  Upon learning of this information, HHC believed this to be an issue of patient safety because of the threat that could potentially be posed to her patients and determined that a "job-related medical inquiry" was appropriate.  HHC further shows that such procedures are consistent with official ADA enforcement guidance.  See also Ward v. Merck & Co., Inc., 2006 WL 83114 *8 (E.D. Pa.  Jan. 9, 2006) (a medical inquiry is appropriate if there is "sufficient evidence for a reasonable person to doubt whether [the] employee is capable of performing [her] job, and the examination [is] limited to determining an employee's ability to perform essential job functions.") (citing Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 813 (6th Cir.1999)).  As to Plaintiff's ultimate termination, HHC contends that it was solely motivated by her failure to comply with its requests to participate in the scheduling of an audiology examination.  It is undisputed that Plaintiff received at least one letter explaining that she needed to contact HHC by telephone and schedule a hearing examination by a certain date and that non-compliance with this request would be considered a voluntary resignation.  Plaintiff did not call HHC as required by the letter, and she was thus terminated.  These explanations are sufficient to meet HHC's "exceedingly light" burden on summary judgment of articulating a legitimate non-discriminatory reason for its actions.

Once HHC has proffered a non-discriminatory reason for an adverse employment action, the burden shifts back to Plaintiff to prove the proffered reasons are mere pretext for the true discriminatory motive. To show that a defendant's stated reasons are pretext, the plaintiff must offer evidence "demonstrat[ing] that the proffered reason was not the true reason for the employment decision." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).  The plaintiff may do this by showing "that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).  The evidence of pretext may include the same evidence offered initially to establish the prima facie case.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th

24

Cir. 2004).  However, "[i]f the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason[; she] must meet it head on and rebut it. Quarreling with that reason is not sufficient." Id.  (cites omitted).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253. Thus, a plaintiff may only prevail "by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination." Wilson, 376 F.3d at 1088.  Plaintiff has none neither in this case.

As to pretext, Plaintiff shows, again, that the February incident was caused by no fault of her own and that no other nurses were subjected to similar scrutiny thereafter.  However, for the same reasons this evidence does not support Plaintiff's prima facie case, it also does not support an inference of pretext.  In fact, in attempting to establish pretext, Plaintiff merely quarrels with the legitimate non-discriminatory reason offered by HHC.  HHC's reasons, however, are ones that might motivate a reasonable employer.  Thus, on summary judgment, Plaintiff do more than argue with the wisdom of the employer's decisions; she must meet those reasons head on and rebut them. Id.  She has failed to do so here. Plaintiff's sole reliance upon HHC's request for a skills assessment and audiology examination is insufficient to show pretext.  Inasmuch, there is no evidence or argument before the Court showing that HHC acted differently in this case than it normally has or would in a case involving an employee without a covered disability.

Plaintiff likewise fails to sufficiently rebut HHC's explanation that she was terminated due to her failure to comply with HHC's request to cooperate in getting a medical examination rather than because of a discriminatory animus against the hearing impaired.  There is no evidence before the Court

that Plaintiff ever complied with HHC's requests.  She admits that she never participated in the requested audiology examination, and she identifies no evidence establishing that she provided a copy of her own audiologist's report for HHC by the requisite date.  HHC, in fact, contends that Plaintiff never testified that she ever produced a copy of the report from her audiologist to anyone at HHC.  Plaintiff attempts to explain, however, that she attempted to contact HHC in other ways and that she did not feel the need to call HHC because she had already filed a complaint with the EEOC.  Certainly, HHC could have decided to consider Plaintiff's responses and made further attempts to communicate with Plaintiff.  It is not for this Court, however, to determine whether HHC was unreasonable in refusing to consider her efforts prior to terminating her for non-response to its letter.  Again, this Court does not "sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [federal law] does not interfere. Rather, [the Court's] inquiry is limited to whether the employer gave an honest explanation of its behavior . . . ."  Elrod, 939 F.2d at 1470 (cites omitted).  HHC has provided sufficient evidence that it has given an honest explanation for its actions in this case, and there is insufficient  evidence to the contrary.

Ultimately, the Court must decide whether there is sufficient evidence at bar to establish that the decision to terminate Plaintiff was discriminatory.  There is not.  There is no evidence in this case that HHC was ever faced with a similar situation of non-compliance and failed to terminate a non-disabled employee, nor is there otherwise sufficient circumstantial evidence of discriminatory intent.  For these reasons, Defendant's Motion for Summary Judgment is due to be **GRANTED** as to Plaintiff's disparate treatment claims.

**CONCLUSION**

For the aforementioned reasons, Defendant HHC's Motion for Summary Judgment is hereby **GRANTED** *in part*. The Motion is **GRANTED** as to Plaintiff's "failure to accommodate claim" arising out of accommodations never requested by Plaintiff, i.e., an amplified stethoscope and a monitor for overhead announcements, and as to Plaintiff's claims of disparate treatment. The Motion is **DENIED**, however, as to HHC's alleged failure to provide reasonable accommodations for telephone amplifiers on each floor, a TTY telephone, a text telephone, a visual alarm, and a sign-language interpreter.

SO ORDERED this 2nd day of February, 2009.

S/ C. Ashley Royal
C. ASHLEY ROYAL
United States District Judge

JLR/cw